IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

SHRODDRIC DURELL MITCHELL                                              PLAINTIFF

v.                                    Civil No. 4:09-cv-04071

CHARLES NEFF, Administrator,
Miller County Detention Center; and
MAJOR GARY TURNER, Miller
County Detention Center                                               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Shroddric Durell Mitchell filed this civil rights action pursuant to the provisions of

42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis.*

The events at issue in this case occurred while Mitchell was incarcerated at the Miller County

Detention Center (MCDC).  Specifically, Mitchell maintains that on January 18, 2009, the

Defendants failed to protect him from attack by fellow inmates.

On October 26, 2011, an evidentiary hearing was held.  At the hearing, the testimony of the

following witnesses was taken: (1) Shroddric Mitchell; (2) Wiley Eason; (3) Paul Sutton; (4) Don

Cornell; (5) Major Gary Turner; and (6) Jail Administrator Charles Neff.  At the conclusion of the

hearing, the record was left open so that Mitchell's medical records could be obtained from St.

Michael Health System.  Those records have now been received.[1]  The record was also left open for

Defendants to check their records for any photographs of Mitchell taken after the January 18, 2009

incident and any written records from the Criminal Investigation Division.  The Court has been

---

[1] The records have been labeled Court's Exhibit 1.

-1-

advised by letter that no photographs or records other than those admitted into evidence during the hearing were located.[2]

### 1.  Background

For purposes of discussion, the testimony of the witnesses will be summarized.

***Shroddric Mitchell***

Mitchell was incarcerated at the MCDC from December of 2008 until August of 2009.  He is currently incarcerated in the Arkansas Department of Correction (ADC), Ouachita River Correctional Unit.  At the time of the incident at issue in this case, Mitchell was in pretrial status.

For the months of December and January, Mitchell was assigned to Max B-pod which he described as an open barracks type pod that housed felons.  He testified that contraband was readily available and you could obtain anything you wanted.   In his words, it was like having a "big party" with smoking, drinking, and talking on cell phones.

Mitchell testified Krashun Nard and Janarieo Dillihunt were both from Ashdown, Arkansas, and were like a gang.  According to Mitchell, Nard and Dillihunt would just get into random fights with other inmates over cigarettes or a cell phone.  Mitchell believed they had been in six or seven fights during the month and a half leading up to the assault on him.  Mitchell indicated that Sergeant Bailey would make rounds and knew about the fights, but he was buddies with the inmates and would bring in cigarettes.

From Max-A pod, Mitchell testified the inmates could take a broomstick, stick it out the bean hole in their doors, and hit the button popping open the door for the control center.  Inmates then got into the control center and would open other doors.  Inmates left the pod and basically just did what

---

[2]The letter has been labeled Court's Exhibit 2.

they wanted.  On at least one occasion, the inmates took the keys and went over to the women's pod.

Periodic shakedowns were performed, during which contraband was confiscated.  However, Mitchell testified that the officers would bring the contraband right back in with them.  Eventually, most of the officers involved with bringing contraband into the facility either resigned or got fired and one officer was criminally charged.

On January 18th, Mitchell testified that he took a shower and then went to his bunk and started eating cookies.  Nard came up to Mitchell and reported that another inmate, Brian Davis, had said Mitchell had Nard's SIM card from his cell phone.  Mitchell denied it.

About an hour and a half later, at approximately 11:00 p.m. or midnight, Mitchell was in the day-room when Davis came up to him and started hitting him with a shower shoe.  Mitchell started chasing Davis around the lunch tables.

The day-room was located up some steps from Mitchell's room.  Another inmate, referred to as Big Bob, came in and told Mitchell not to worry.  Mitchell went back to his bunk and Nard, Davis, Lee Smith, Dillihunt, and Roy Vaughn came into Mitchell's room.  Mitchell heard someone say from the door that he would pay marijuana to have Mitchell jumped.

Nard had a pipe in his hand and Davis had something in a sock.  Mitchell testified that he moved to the corner and was first struck by Nard.  Mitchell then felt "a lot" of hands on him.  Mitchell testified that after approximately five minutes, he was able to break loose and went to hit the door to get the attention of the control officer.

According to Mitchell, there were only two officers working that night and there was no one at the control center after 8:00 p.m.  While there was a camera in the pod, Mitchell testified the wires

had been torn off.  Moreover, Mitchell testified that at least half the time no one was in the control center.

The panic button, that could allegedly be used to summon help, was not working.  According to Mitchell, Sergeant Ballard was at the front desk and Deputy Turner was working in the kitchen area, where inmates were preparing the meals for the next day.

When Mitchell did not see any officers, he ran back to his bunk and the inmates followed him and again began hitting him with a pipe and their hands.  Mitchell recalled Nard striking him with a wire and Davis kicking him.  Mitchell testified he was screaming and, during the course of the beating, blacked out for a couple of seconds.  Mitchell stated the altercation went on for approximately an hour.  Mitchell sustained several cuts to his head and bruises, cuts, and abrasions to his arms, hands, back, and ear.  Court's Exhibit 1 at pg. 6.  Mitchell indicated he has a scar about one and a half to two inches long from being beaten, as well as marks on his left arm and shoulder.  He also indicated his glasses were broken during the altercation.  Finally, he indicated his back was strained in some manner and still bothers him.

After a period of time, Mitchell saw Sergeant Ballard and a state trooper coming down the hall.  Mitchell beat on the door and was told to back away by the state trooper.  At the time, Mitchell states he was badly bleeding and his clothes were torn.  Davis handed Sergeant Ballard a shank and said it was Mitchell's.  Davis slapped Mitchell in front of the state trooper.

Mitchell was taken to the front of the facility and saw four or five state troopers standing around.  He testified that photographs were taken of his face, both arms, and his back.  He told Sergeant Ballard what happened; he was allowed to shower, and was taken to the hospital by a state

trooper.  At the hospital, Mitchell's wounds were cleaned; antibiotic cream was applied; the wounds were bandaged; and he was given pain medication.

When he returned to the MCDC, Mitchell was placed in a holding cell where he remained for two weeks.  He was given Tylenol and ice for his back.  Mitchell was then placed in the misdemeanor pod.

Prior to January 18th, Mitchell had not been in any fights with the inmates who attacked him that day and, in fact, had not communicated with any of the five inmates.  He had received no threats from them but was not involved in any of the activities at the time and kept to himself.   While Mitchell testified that he did not feel like he was in danger, he believed it was risky being in the jail. He believed that he would eventually be involved in some kind of altercation.

At some point after the incident, Mitchell discussed the incident with Major Turner, Sergeant Davis, and Sergeant Giles.  Mitchell asserted that he completed a grievance about the incident and gave it to Sergeant Daily.  Mitchell also indicated that he made a written statement that he turned over to Major Turner's clerk.  According to Mitchell, Major Turner indicated that something was going to be done to rectify the situation.

Later, Mitchell was advised by Deputy White that the investigation into the incident was complete.  At that time, somewhere around June, Mitchell filled out another grievance and gave it personally to Major Turner.   Mitchell spoke with both Major Turner and Administrator Neff in Major Turner's office about the investigation.  Mitchell testified that he was informed he could be charged with having a prohibited device, a cell phone.

According to Mitchell, the five inmates involved in the altercation with him were involved in a number of random fights.  Typically, the fights were over some type of contraband such as cigarettes.

**_Wiley Eason_**

Eason testified that he was incarcerated in the MCDC in January of 2009.  On January 18th, Eason was a trustee and worked in the kitchen.  While Eason did not see the attack on Mitchell, he testified he saw Mitchell afterwards and he was looking rough--his face was bandaged; his ear was "messed" up; and his hands were wrapped up.

Eason testified that the inmates involved in the assault were "bragging" that they had beaten Mitchell with pipes to "show" him that he was not running the pod.   In Eason's words: "it was a power struggle" over "weed" and cigarettes coming into the jail.  The contraband was getting into the facility, among other ways, through a hole in the roof the inmates had made.  An inmate, using the hole in the roof, would go out, obtain the contraband, and bring it back to the jail.  According to Eason, it took a "long time" for the guards to catch onto the fact that inmates were smuggling contraband in through a hole in the roof.   Contraband was also brought into the facility by jail staff.  Eason stated it was all about the money--the buying and selling of contraband.

Eason testified that there had been a number of fights between the inmates prior to the January 18th fight.  Eason, however, could not recall the dates or the names of all inmates involved but did recall Roy Vaughn (nicknamed Black), Dillihunt, Nard, and Bryan (nicknamed Smurf) were involved.  If the inmates involved were caught, Eason said they were sometimes put on lockdown and other times transferred to a different facility.  The inmates involved in the attack on Mitchell were locked down after the attack.

According to Eason, Administrator Neff and Major Turner knew about the fights even though they were not present when they occurred.  Eason testified that whenever something happened at the jail, a sergeant would call and let Major Turner and Administrator Neff know what had happened.

Eason testified that there was no working camera in the pod and in fact the camera  was turned towards the ceiling.  The panic button was not working, as inmates had taken the motor out of it to make a tattoo gun. If inmates did not want to be seen fighting, they would go into the corner of the pod where a deputy in the control center would not see the fighting.

Eason testified that there are no deputies stationed in the pod.  However, from the control center, the deputies could see directly into the pod.  Their vision was hampered, however, by the fact that most of the lights were out in the pod.

Eason testified that on an infrequent basis, deputies would walk around the pods.  According to Eason, there was usually only one deputy assigned to the control center at a time.  When that deputy had other duties to perform, the control center would be empty.

### Paul Sutton

Sutton, currently an ADC inmate, testified that he was incarcerated at the MCDC in January of 2009 and housed in Max A-pod.  He described the atmosphere in the jail as being very violent with frequent fights and the prevalent use of contraband such as drugs and cigarettes.  He testified that contraband came into the jail a number of ways including inmates climbing out onto the roof of the jail, leaving the facility, and returning with contraband.  Sutton testified he saw just about everything in the jail, including marijuana, crack cocaine, hack saws, shanks, and cell phones.  If an inmate saw something he wanted, he just took it.

-7-

Sutton characterized the jail as out of control.  Sutton testified that Major Turner was attempting to get the jail under control by bringing new or additional officers in, having shakedowns, sealing up holes, and using lockdown as punishment.

On January 18th, Sutton was watching through the windows between Max A-pod and Max B-pod and saw inmates attacking Mitchell.  He recalled Nard, Vaughn, and Dillihunt being involved.  At the time, there was no guard around.  Sutton indicated the fight lasted for ten to fifteen minutes and perhaps longer.

Generally, Sutton testified there were only two officers working at a time.  However, he stated there were long periods of time when you never saw a guard.  On January 18th, Sutton did not see a guard after shift change.  Sutton testified it was possible a guard was there and he did not see him because Sutton was in his cell doing drugs at the time.

Sutton was involved in a few fights with Vaughn and Dillihunt but had no problems with Nard.  Sutton indicated he did a "lot of attacking."

Sutton testified that if the guards were around, they would break up the fight and then try to separate the inmates.  Despite the separation, Sutton testified he could "get to" any inmate he wanted to fight.

### *Don Thornell*

In January of 2009, Thornell worked in the Criminal Investigation Division of the Miller County Sheriff's Office.  He was not involved in the investigation of the assault on Mitchell.

According to Thornell, another investigator, Cecil White, who is no longer with the Sheriff's Office, would have been the one to investigate the incident.  As noted above, no records of an investigation into the incident or photographs of Mitchell following the incident could be located.

-8-

### Gary Turner

In August of 2008, Turner started working for the Miller County Sheriff's Department as a Major. In this position, he testified he was chief of security.

Major Turner testified that he was not at work on January 18, 2009, and had no independent recollection of the incident involving Mitchell or of seeing reports regarding the incident. Major Turner never personally witnessed any fights or broke up any fights.

Major Turner testified that, at that time, the inmates had control of the jail, contraband was everywhere, and inmate violence was a problem. The jail itself was in bad physical condition; the employees were not properly trained; and employees treated the inmates like friends. There were actual fights and fights were also staged as a diversionary tactic to allow contraband into the jail.

In an attempt to gain control of the jail, new officers were hired, a training program was started, a team was assembled to combat drugs, shakedowns occurred nearly every other day, and officers were placed on the roof until it could be completely fixed.

The jail sergeants reported to Major Turner. When a fight occurred, if physically possible, the inmates involved were separated and put into single cells. However, at the time at issue in this case, the jail was overcrowded. Major Turner testified that they would have done the best they could to separate the inmates involved. Additionally, inmates viewed as trouble makers were sent to be housed at other facilities.

Major Turner testified that Administrator Neff was the policy maker for MCDC. At the time in question, Major Turner and Administrator Neff were just coming into the jail and getting their policies and procedures established. There were no written policies in existence and no training for jailers. There was no policy in existence at that time requiring deputies to report all incidents of

violence.  There was no policy requiring documentation of any injury to inmates.  Major Turner
testified that it was possible that deputies saw an incident and did nothing about it.  Although there
was no written grievance policy, Cecil White was in charge of grievances and investigating fights.

Major Turner testified that if an inmate was worried about his safety, he could verbally inform
a sergeant or write a grievance.  During this time, the jail population was approximately 320 inmates.
Major Turner testified that it took more than two officers to run the jail.  Specifically, he testified that
an officer was needed in the control room, in the intake area, a supervising sergeant, and two officers
were needed in the jail.  However, there was no policy in place requiring a specific number of officers
be on duty to run the jail and Major Turner could not say if there were in fact five officers on duty
on January 18th.

### Charles Neff

In January 2009, Charles Neff became the jail administrator.  Linda Rambo had been the
Miller County Sheriff and had resigned.

Administrator Neff testified that the inmates had literally destroyed the jail-- the cameras were
not working, there was no security on the windows, and the inmates could unlock the cell doors.
With respect to contraband, Administrator Neff echoed the prior testimony that the inmates would
go out a hole in the roof of the jail and bring contraband back into the jail.  Jail staff were also
bringing contraband in, socializing with the inmates, sleeping on duty, and in general used to being
unsupervised.

In an attempt to get things under control, they started reviewing staff qualifications and
training and setting up procedures for locking doors, shaking down cells, and handling riots.  During

-10-

the first four and a half months, numerous officers were terminated and more experienced officers were hired.

Administrator Neff testified that he had no specific recollection of the five inmates involved in the altercation with Mitchell.  At the time, Administrator Neff believed there were approximately 312 inmates.  He testified that if a fight occurred, an effort was made to determine what occurred and the involved inmates were moved  or separated.

Administrator Neff testified that at any given time, there should have been five staff members on duty--one in the booking room; one in the main control center; one in the max control center; one in the other housing unit; and a sergeant.  No records were kept of the staff members on duty for each shift other then the necessary documentation regarding time and attendance for payment of wages.  Even these records have been discarded.

Administrator Neff testified that there were occasions when officers were not at their posts.  He testified that they immediately established a rule that if control center personnel were not at their posts, action would be taken against them.

Administrator Neff testified that logs were non-existent at that time.  He indicated it took a month and a half just to get the escapes stopped.

### 2.  Discussion

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  Holden v. Hirner, 663 F.3d 336, 340-41 (8th Cir. 2011)(citing Farmer v. Brennan, 511 U.S. 825, 833 (1994)).  The claims of pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment while the claims of convicted prisoners are analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment.  Id. at pg. 341 (citation omitted).  "This

makes little difference as a practical matter [since] [p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007).

To prevail on his failure to protect claim, Mitchell must first prove he was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. "This is an objective requirement to ensure the deprivation is a violation of a constitutional right." Holden, 663 F.3d at 341 (citation omitted). Second, Mitchell must "establish the prison officials were deliberately indifferent to inmate health or safety. This is a subjective requirement, mandating the prisoner prove the official both knew of and disregarded an excessive risk to inmate health or safety." Id. (citation and internal quotation marks omitted).

The evidence presented in this case is sufficient to establish that Mitchell was incarcerated under conditions posing a substantial risk of serious harm. Defendants themselves testified that jail staff were not in control of the jail; contraband, including weapons, was everywhere; inmate fights, both actual and diversionary, occurred frequently; and inmates could unlock their own cell doors and even escape from a hole in the roof of the jail. Additionally, the cameras and panic buttons did not work and the jail was not adequately staffed. In short, the atmosphere at the jail was both chaotic and unsafe.

Next, it must be determined whether there was sufficient evidence to establish the Defendants knew of and were deliberately indifferent to the danger. "The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness." Holden, 663 F.3d at 343.

Mitchell has brought claims against Defendants in both their individual and official capacities. "In an individual capacity claim under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law."  Wagner v. Jones, 664 F.3d 259,  268 (8th Cir. 2011).  No evidence was presented suggesting Defendants were present when the attack on Mitchell occurred or knew about the attack at the time.

As supervisors, Defendants are "only liable for [their] . . . own misconduct and [are] not accountable for the misdeeds of [their] agents under a theory such as respondeat superior."  Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010).  "A supervisor can be found liable under § 1983 for deliberate indifference if he is aware of a substantial risk of serious harm, even if he is not aware that harm has, in fact, occurred."  Kahle v. Leonard, 477 F.3d 544. 551-52 (8th Cir. 2007). "[T]o maintain an action for training or supervisory liability, a plaintiff must show the failure to train or supervise caused the injury."  Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011).  A supervisor is liable "when the supervisor's corrective inaction constitutes deliberate indifference" or tacit authorization.  Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002)(citation omitted).

Evidence of the surrounding circumstances can be used to prove the required element of subjective knowledge.  Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998).  "The question of whether the official knew of the risk is subject to demonstration, like any other question of fact, by inference from circumstantial evidence."  Id.  (internal citation omitted).

In this case, Major Turner started at the MCDC in August of 2008.  The incident at issue in this case did not occur until January 18th--five and a half months later.  The evidence is undisputed that the jail was in chaos during this time period.  Inmates were escaping and returning to the jail with contraband.  There were frequent fights among inmates.  Jail staff brought contraband into the jail,

-13-

slept on duty, treated the inmates as their friends, and either did not document, or were not required to document, any incidents at the jail involving physical harm to an inmate or staff member.  The jail was physically in bad shape, the cameras and panic buttons did not work, it was understaffed, and the staff available did not have the necessary training or the guidance provided by written policies and procedures.

Major Turner had a duty to protect prisoners from violence at the hands of other prisoners. He was aware of the state the jail was in.  While he testified that he was trying to correct the problems, his efforts were apparently unavailing as the chaotic situation still existed in the jail in January of 2009.  See Riley v. Olk-Long, 282 F.3d 592, 595 (8th Cir. 2002)(Security director was aware that sexual misconduct involving guards and inmates was a big concern and knew, from weekly meetings, of the investigations into the conduct of a prison guard.  Despite this knowledge, security director allowed guard to resume his prison duties.  It may be inferred from the evidence that security director recognized guard was a problem employee who posed a substantial risk of harm); Spruce, 149 F.3d at 786 ("[I]f a plaintiff presents evidence of very obvious or blatant circumstances indicating that the defendant knew a risk existed, the [fact finder] may properly infer the official *must* have known"); Cf. Bailey v. Wood, 909 F.2d 1197-1199-1200 (8th Cir. 1990)(pervasive risk of harm exists when violent assaults occur with sufficient frequency that plaintiff is put in reasonable fear of his safety).  Clearly, Major Turner failed to take the necessary remedial, corrective, or protective measures despite his knowledge of the very serious problems existing at the jail.  The failure to train and supervise created the chaotic and dangerous situation existing in the jail.  See e.g., Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996)(Plaintiff must show the failure to train or supervise caused the injury).  His failure constitutes deliberate indifference.

-14-

We turn to the question of whether Major Turner is entitled to qualified immunity.[3] "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). Qualified immunity is a defense available only to government employees sued in their individual capacity. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).

The qualified immunity inquiry consists of two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010). The order in which these questions are addressed is left to the discretion of the judge. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As discussed above, the facts establish a failure to protect claim against Major Turner. Moreover, an inmate's right to be free from attack by fellow prisoners was clearly established in 2009, such that a reasonable person standing in Major Turner's shoes would have understood that the failure to take necessary steps to alleviate the risk of attack violated Mitchell's rights. See e.g., Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996)(it is well settled that the Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners); see also Langford v. Norris, 614 F.3d 445, 462 (8th Cir. 2010)(Court must examine whether, given

---

[3] Major Turner failed to address the issue of qualified immunity in his previously filed summary judgment motion. Nevertheless, the Court will address the issue of qualified immunity, as Major Turner did assert this defense in his answer. (Doc. 9 ¶ 8).

the facts known to the official at the time, a reasonable official would have known that his actions violated the law).  Major Turner is not entitled to qualified immunity.

With respect to Administrator Neff, he did not begin working at the MCDC until January of 2009.  The incident occurred just two and a half weeks later.  Given the state of the jail when Administrator Neff took it over, it cannot be said that he acted with deliberate indifference, as it would have been nearly impossible for him to have taken all the corrective measures necessary to prevent the attack during such a brief time period.

"A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010).  Thus, the claims against Major Turner and Administrator Neff, in their official capacities, are the legal equivalent of claims against Miller County.  Bankhead v. Knickrehm, 360 F.3d 839, 844 (8th Cir. 2004).

As to Mitchell's official capacity claims, these are treated as claims against Miller County itself.  See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010).  To establish Miller County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted).  The applicable law was summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom  was adopted with "deliberate indifference" to its known or obvious consequences. Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir.2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. Speer v. City of Wynne, 276 F.3d 980 (8th Cir.2002); Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were

personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. Szabla v. City of Brooklyn Park, 486 F.3d 385, 389-90 (8th Cir.2007).

Id. at 817-18.

"[I]naction or laxness can constitute government custom if it is permanent and well settled. Such a government custom or laxness or inaction must be the moving force behind the constitutional violation." Tilson v. Forrest City Police Department, 28 F.3d 802, 807 (8th Cir. 1994). In this case, the evidence establishes that there were no written policies or procedures for various aspects of running the jail, including documenting fights between inmates or inmates and jail staff. There were no standard procedures on how to respond to such instances. The lack of training of jail staff, the failure to have in force policies and procedures, coupled with the living conditions, the overcrowding, and the ease of obtaining contraband resulted in unsafe conditions. Cf. Bordanaro v. McLeod, 871 F.2d 1151, 1162 (1st Cir. 1989)("[T]he failure of the Mayor and Chief of Police to institute a minimally acceptable program of recruitment, training, supervision or discipline amount to a deliberate indifference to the constitutional rights of the city's inhabitants"). The evidence established a pattern of inadequate training and safety measures which left jail staff ill prepared to deal with the duties necessary to maintain custody, control, and the safety of the detainees. Together, these inadequacies resulted in the prevailing atmosphere of violence at the jail and a staff ill-prepared, ill-equipped, or unwilling to perform the recurring duties of the jail staff. Miller County's response was to do nothing, or do too little, when circumstances required active steps to be taken . See e.g., Tilson, 28 F.3d at 813 ("[T]he City failed to adopt any such procedures, and this failure resulted in the deprivation of Tilson's Fourth Amendment rights"). Miller County's inaction was the moving force

-17-

behind the constitutional violation.  See e.g. Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992)("a local governmental body may be liable if it has a policy of inaction and such inaction amounts to the failure to protect constitutional rights").

### 3.  Damages

The issue now becomes what relief Mitchell should be awarded against Major Turner in both his individual and his official capacities.  Compensatory damages under § 1983 are governed by general tort-law compensation theory.  See Carey v. Piphus, 435 U.S. 247, 255 (1978).  In *Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . . constitutional rights and to have caused compensable injury."  *Id.* (internal quotation marks and citations omitted).  The law generally provides that damages may be awarded for injuries such as mental anguish and suffering, personal humiliation, and monetary losses.  Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307  (1986)(citations omitted).  However, damages may not be awarded for the abstract or subjective value of the constitutional right at issue.  See Stachura, 477 U.S. at 308; Carey, 435 U.S. at 248.

The generally applicable rules have been altered when it comes to civil rights actions brought by prisoners.  The Prison Litigation Reform Act (PLRA) limits inmates' recovery "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1996e(e); see also Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)(the physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners.").

In this case, Mitchell testified that he suffered physical injury in the form of several cuts to his head and bruises, cuts, and abrasions to his arms, hand, back, and ear.  His testimony is supported

by the medical records and Eason's testimony.  He has a scar approximately one to two inches long as well as marks on his left arm and shoulder.  His glasses were broken during the altercation.  Additionally, he indicates his back was strained and he still had some problems with it.  Mitchell has sufficiently satisfied the physical injury requirement of § 1997e(e).

I recommend that Mitchell be awarded  damages in the amount of $5,000.00 for his physical injuries, his emotional pain and suffering, and for his glasses.  Cf. Boesing v. Spiess, 540 F.3d 886, 889-90 (8th Cir. 2008)(upholding $5,000.00 compensatory award to arrestee who, while handcuffed, was sprayed with mace and struck on head and back with baton, sustaining a laceration on his head and deep bruises on his back and side); Jackson v. Crews, 873 F.2d 1105, 1109 (8th Cir. 1989)(upholding jury award of over $5,000.00 in compensatory damages to arrestee who had his face slammed into the pavement by arresting officer); Williams v. Omodt, 640 F.  Supp. 120, 123 (D. Minn. 1986)(awarding inmate $5,000.00 in actual damages for bruises, contusions, swelling, and considerable pain he sustained from being choked, forced to the ground, and hit several times by officer).  I will also recommend that Major Turner be required to pay the district court filing fee of $350 (Doc. 3) that has been assessed against Mitchell.

An award of punitive damages against the Major Turner in his official capacity may not be made.  Such an award would be the equivalent of an award against Miller County and is precluded by the Supreme Court's ruling in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981).  Further, the facts of this case do not support the imposition of punitive damages against Major Turner in his individual capacity.  In § 1983 cases it has been said that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Walters v. Grossheim,

990 F.2d 381, 385 (8th Cir. 1993)(internal quotation marks and citation omitted).  I do not believe the evidence elicited shows the conduct was motivated by evil motive or intent or involved reckless or callous indifference to Mitchell's federally protected rights.

### 4. Conclusion

For the reasons stated, I recommend that judgment be entered against Major Turner in his individual and official capacity and in favor of the Plaintiff in the amount of $5,000.00.  I also recommend that the Major Turner be required to pay the district court filing fee of $350 (Doc. 3) that has been assessed against Mitchell.  Finally, I recommend Plaintiff's claims against Administrator Neff be dismissed with prejudice.

**The parties have fourteen (14)  days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of May 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE